IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 08-cv-02626-MSK-CBS

MARCO CARANI, and
SHELLEY DEMARIE CARANI,

        Plaintiffs,

v.

DARREL MEISNER,
J.R. BOULTON,
SAMUEL STEWART,
KIRK WILSON,
JOHN HIER,
WANDA NELSON,
WILLIAM SAPPINGTON,
LOU VALLARIO, and
SCOTT DAWSON,

        Defendants.

_____

**OPINION AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT**
_____

      **THIS MATTER** comes before the Court pursuant to former Defendant Erin Sims'

Motion for Entry of Final Judgement **(# 94)**, the Caranis' response **(# 106)**, and Ms. Sims' reply

**(# 109)**; Defendants Boulton, Meisner, Stewart, Wilson (collectively, "Rifle Police

Defendants"), Hier, and Sappington's (collectively, the "Rifle Public Works Defendants"),

Motion for Summary Judgment **(# 116)**, the Caranis' response **(# 122)**, and the Rifle Police and

Public Works Defendants' reply **(# 124)**; Defendants Dawson and Vallario's Motion for

Summary Judgment **(# 132)**, the Caranis' response **(# 142)**, and Defendants Dawson and

Vallario's reply **(#144)**; and an outstanding issue relating to the admissibility of opinion

1

testimony under Fed. R. Evid. 702 by Mr. Cook (**# 131**) for which the parties have submitted

supplemental briefs (**# 152, 153**).[1]

<h2 style="text-align:center"><u>FACTS</u></h2>

The Court will summarize the operative facts[2] here, and elaborate as necessary as part of

its analysis.

In or about October 2007, Ms. Carani became convinced that her husband, Mr. Carani,

was having an affair with a co-worker, former Defendant Erin Sims. Ms. Carani responded by

placing phone calls to Ms. Sims, Ms. Sims' husband, Ms. Sims' supervisor, and one of Ms.

Sims' co-workers, advising them of the matter. In sympathy for Ms. Carani, two of her friends

undertook a brief campaign of harassment of Ms. Sims, one leaving insulting notes on her parked

car, and the other driving past Ms. Sims' house while shouting insults.

On November 1, 2007, Ms. Sims reported the situation to Defendant Wilson at the Rifle

Police Department. Mr. Wilson investigated the matter and, after consulting with Defendant

Boulton, concluded that Ms. Carani's actions constituted a crime. Mr. Wilson prepared an

affidavit for warrantless arrest of Ms. Carani for the offense of "harassment – stalking and

domestic violence."

Ms. Carani was called to the Rifle Police Department on Friday, November 2, 2007 to

give a handwriting sample. Upon her arrival, she was arrested by Defendant Stewart. Because

---

[1] In addition, there are pending motions seeking a ruling with regard to the admissibility under Fed. R. Evid. 702 of opinions from Charles McRory (**# 115, 150**). The admissibility of Mr. McRory's opinions was resolved at a hearing on April 23, 2010 (**# 151**). The Clerk of the Court shall terminate these motions.

[2] These are undisputed facts, or where there is a dispute, the Court construes them most favorably to the non-movant.

she was charged with a domestic violence offense, she was not permitted to be released on bond until her initial appearance on the following Monday.  She was booked into the Garfield County Jail from November 2, 2007 until November 5, 2007, and was released on bond following her initial appearance.  The charges against her were later dismissed.

The Caranis' Second Amended Complaint **(# 34)** alleges seven causes of action: (i) false arrest, apparently arising under Colorado common law, by Ms. Carani against each of the Rifle Police Defendants; (ii) slander, apparently under Colorado common law, by Mr. Carani against the Rifle Public Works Defendants, in that they stated falsely to others that Mr. Carani "was not permitted to work on public works projects for the City of Rifle for reasons related to his job performance while at Rifle Public Works"; (iii) outrageous conduct, apparently arising under Colorado common law, by the Caranis against all Defendants; (iv) a claim for "willful and wanton conduct" by the Caranis against all Defendants[3]; (v) a claim pursuant to 42 U.S.C. § 1983 by Ms. Carani against Defendants Vallario and Dawson for violation of her 14th Amendment right to Due Process of Law, in that her conditions of confinement in the Garfield County Jail were in violation of the U.S. Constitution; (vi) false imprisonment, apparently under Colorado common law, by Ms. Carani against the Rifle Police Defendants[4]; and (vii) a loss of consortium claim by Mr. Carani against all Defendants.

---

[3]The Caranis' summary judgment response concedes that the outrageous conduct and willful and wanton conduct "claims" are "not [ ] separate cause[s] of action."  The Court deems this to constitute a withdrawal of such claims.

[4]This claim was also asserted against Ms. Sims.  By Order **(# 90)** dated August 26, 2009, this Court dismissed all claims against Ms. Sims'.

<u>**ANALYSIS**</u>

**A. Summary judgment motions**

    1. <u>Standard of review</u>

    Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

    If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(e). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry*

*v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

2. <u>Rifle Public Works Defendants</u>

In light of the Caranis' concession that they are not asserting a separate, standalone claim for outrageous conduct, the only claim asserted against the Rifle Public Works Defendants is Mr. Carani's claim of slander.

To establish a claim for slander/defamation under Colorado law, Mr. Carani must show: (i) a defamatory statement; (ii) published to a third party; (iii) scienter amounting to at least negligence on the part of the speaker; and (iv) special damages suffered by the plaintiff or actionability at law regardless of the existence of special damages. *Han Ye Lee v. Colorado Times, Inc.*, 222 P.3d 957, 961 (Colo. App. 2009). Under Colorado law, a statement is defamatory when it "holds an individual up to contempt or ridicule and causes injury or damage." *WIlson v. Meyer*, 126 P.3d 276, 279 (Colo. App. 2005). The statement must necessarily be an assertion that is capable of being true or false, as falsity of the statement is a *sine qua non* of a slander claim. *See e.g. McIntyre v. Jones* 194 P.3d 519, 528 (Colo. App. 2008)

("If the statement is true, it is not actionable . . .").

The Public Works Defendants identify three statements that Mr. Carani contends were slanderous: (i) one of Mr. Carani's co-workers at SGM (Mr. Carani's subsequent employer) told Mr. Carani that he had been told by Defendant Sappington that Mr. Carani "was not to work for SGM on any projects SGM had with the City of Rifle"[5]; (ii) when Mr. Carani encountered Defendant Hier while working on an SGM project for the City of Rifle, Mr. Heir stated "what the fuck is that guy doing in this town?"; and (iii) a former co-worker of Mr. Carani's told Mr. Carani that, at a meeting, Mr. Hier had stated that Mr. Carani "was not allowed on City property." Mr. Carani's response to the Public Works Defendants' motion does not dispute that these are the only three statements upon which his slander claim is premised.

The Court promptly disposes of the second statement – that Mr. Heir asked "what the fuck is that guy doing in this town?" Mr. Heir's statement is a question, not an assertion, and implies nothing more than the fact that Mr. Heir was surprised that Mr. Carani remained in the City of Rifle or that Mr. Heir did not believe that Mr. Carani should have remained in the City. The question does not imply the existence of a fact that can be proven to be true or false, and thus, cannot be defamatory. *C.f. Keohane v. Stewart*, 882 P.2d 1293, 1302-03 (Colo. 1994) (question that implied factual assertion capable of being proven true or false could be defamatory).

With regard to the remaining two statements, the Public Works Defendants contend that the statements are not defamatory *per se* – that is, they do not fall within the limited class of

_____

[5]A second SGM co-worker allegedly heard a similar statement, but could not identify the person who said it.

statements that are so inherently injurious that a plaintiff need not prove special damages. *Wilson*, 126 P.3d at 1279. Traditionally, a statement is defamatory *per se* only if its subject matter imputed that the plaintiff was guilty of a criminal offense, had a "loathsome disease," had engaged in sexual misconduct, or concerned "a matter incompatible with the individual's business, trade, profession, or office." *Gordon v. Boyles* 99 P.3d 75, 79 (Colo. App. 2004). However, where the defamatory meaning of the statement may be understood only by means of reference to extrinsic facts known by the recipient, the doctrine of defamation *per se* is inapplicable and special damages must be proven as part of the claim. *Id.*

Here, to the extent the remaining statements – that Mr. Carani was not allowed to work on any City of Rifle projects and that he was not allowed on City property – might be said to impugn Mr. Carani's trade or profession (the only category even arguably applicable), they do so only if the listener is cognizant of a fact extrinsic to the statement itself: that the restrictions on Mr. Carani arose because of some unpleasantness during his previous employment with the City. The statements as recited do not mention Mr. Carani's previous employment with the City or the circumstances thereof, and thus, a listener being told only that Mr. Carani was not to work on City projects might attribute that fact to any number of benign conditions: perhaps Mr. Carani was precluded from doing so based on conflict of interest concerns, or that he had a personal dispute with a City official on the project. Thus, because extrinsic knowledge by the listener is required before the statement can be understood to impugn Mr. Carani's trade or profession, the statements cannot constitute defamation *per se*, and Mr. Carani must plead and prove that he suffered special damages from the statements.

"Special damages" simply mean actual damages resulting from the statement; in other

words, Mr. Carani must come forward with evidence that shows that he was actually, not hypothetically, injured by the statements.

His response on this point is as skeletal, asserting only that "the defamatory statements reduced his value to his employer and hindered his ability to find other employment." In support of this contention, he cites to two passages in his own deposition. In the first, he states that because he was not allowed to work on City of Rifle projects anymore,[6] SGM "had to redo my position," assigning him to different tasks that did not make use of his knowledge of the City. He states that "I feel my status was hurt from that," but admits that it did not result in any loss of salary or cut the term of his employment short. Mr. Carani's own subjective belief that he lost "status" as a result of the statement does not establish that he suffered anything more than theoretical "damage," and thus, is insufficient to establish special damages.

As to his assertion that the statements "hindered his ability to find other employment," Mr. Carani's deposition testimony reveals only that, after he voluntarily left SGM, he "wasn't getting jobs," and he suspected that the City was giving him a bad employment reference. However, he admits that he has no actual knowledge of what information the City was actually providing to his prospective employers. He testified that he has never spoken with anyone at the City of Rifle about the type of reference he was receiving, and no one has ever told him that the City of Rifle had given him a negative reference. On one occasion, he had his stepson call the City, pretending to be a putative employer and asking for a reference for Mr. Carani, and the City employee stated "All I can tell you is that he worked here and the dates he was here." Not

---

[6]Mr. Carani's testimony appears to suggest that the statement that he was not allowed to work on City projects any more was indeed a true one. If so, the statements cannot support a claim for slander in any event.

8

only does this testimony not establish that the City's reference was the cause of Mr. Carani's inability to find work, it has no connection whatsoever to the allegedly defamatory statements that he was "not allowed to work on City projects" and "was not allowed on City property."[7]

Accordingly, Mr. Carani has failed to come forward with evidence sufficient to establish a claim for defamation against the Rifle Public Works Defendants. These Defendants are entitled to summary judgment on the remaining claim against them.

### 3. Rifle Police Defendants

Having abandoned any purported claims for outrageous conduct or willful and wanton conduct, Ms. Carani asserts two claims against the Rifle Police Defendants – common-law false arrest and common-law false imprisonment.[8] Mr. Carani asserts a derivative claim that

---

[7]In alleging that difficulty in finding work constitutes "special damages" attributable to the allegedly defamatory statements made about him, Mr. Carani appears to simply assume that his putative employers were aware of those statements, but he cites to no evidence that would support this assertion. The Court notes that Mr. Carani left the employ of SGM because he was moving to Loveland, Colorado, a municipality more than 230 miles away from the City of Rifle, and thus, one cannot simply assume that Loveland-based employers would be aware of events occurring in Rifle.

[8]The Caranis' summary judgment response appears to suggest that the false arrest and false imprisonment claims are asserted pursuant to 42 U.S.C. § 1983, rather than under Colorado common-law. The iteration of these claims in the Second Amended Complaint gives no indication whatsoever that the Caranis are invoking § 1983 with regard to these claims or asserting the denial of constitutional rights. This is in sharp contrast to the § 1983 claim asserted against Defendants Vallario and Dawson, which specifically references "violation of the Plaintiff's constitutional rights." Moreover, the pleading of the false arrest and false imprisonment claims specifically pleads that the actions were "willful and wanton," suggesting that Ms. Carani was aware that these were common-law claims potentially subject to a claim of statutory governmental immunity, which could be overcome by a showing of willful and wanton conduct. Pleading of "willful and wanton conduct" is unnecessary if the claims were being asserted pursuant to § 1983.

Nevertheless, but for the issue of immunity – which the Court need not reach – the

necessarily stands or falls according to the fate of Ms. Carani's claims.

Under Colorado common law, the torts of false arrest and false imprisonment are essentially identical; the Colorado pattern jury instructions supply the same instruction(s) for both types of claims. *See* Colorado Jury Instructions, 4th Ed. § 21.1. To establish either claim, Ms. Carani must show that: (i) each Defendant, directly or indirectly, restricted her freedom of movement; (ii) each Defendant did so intentionally; and (iii) Ms. Carani was aware that her freedom of movement had been restricted. *Id.* But for a contention that certain Rifle Police Defendants were not personally involved in Ms. Carani's arrest, the Defendants do not dispute that Ms. Carani can establish each of these elements.

The Court then turns to the Defendants' affirmative defense of privilege. Colorado Jury Instruction 21:11 explains that police officers may make a warrantless arrest where: (i) the officer was acting within the scope of his authority at the time of the arrest; (ii) the officer believed and had probable cause to believe that a crime had been committed (whether, in actuality, it had or had not), (iii) the officer believed and had probable cause to believe that the plaintiff had committed that offense, and (iv) the officer arrested the plaintiff for that offense. The Defendants bear the burden of proof on this issue, and thus, to obtain summary judgment on these claims, the Defendants must demonstrate that the facts of this case, even when taken in the light most favorable to the Caranis, establish each of these elements by a preponderance of the evidence.

It is worth noting that with regard to the critical elements – whether the police officer

---

analysis does not differ materially regardless of whether the claims are construed as common-law torts or constitutional claims. *See e.g. Perry v. Board of County Com'rs.*, 949 P.2d 99, 101 (Colo. App. 1997) (discussing false arrest in § 1983 context).

believed and had probable cause to believe that a crime had been committed by Ms. Carani – the inquiry examines the facts <u>as they appeared to the police officers</u> at the time, not the facts as they might have been revealed in hindsight or facts that were not before the police at the time the decision to arrest was made.   In this light, the most direct evidence of what the Rifle Police Defendants understood of the situation is the Affidavit in Support of Warrantless Arrest, issued by Mr. Wilson on November 2, 2007.

The affidavit states that Mr. Wilson had been contacted by Ms. Nelson, who informed him that Ms. Sims had reported that stickers had been placed on Ms. Sims' car in the City Hall parking lot the prior day.  The stickers spelled out "slut" and made a statement to the effect that a Halloween costume Ms. Sims had been wearing the previous day was "the perfect outfit for a home wrecker."  The affidavit further stated that Ms. Nelson reported that Ms. Sims had stated that Ms. Carani "had driven by her earlier that day and yelled 'home wrecker' at her."

Next, the affidavit recites information obtained from Ms. Sims herself.  Ms. Sims reported that Ms. Carani had called Ms. Sims approximately a week earlier and had stated that "you had an affair with my husband," that "I'm gonna make you feel the way I feel," "I'm gonna call your husband and tell him what you've done," "I'm gonna call your boss and tell him what you've done," and "You can consider this a threat."  Ms. Sims confirmed that she had observed Ms. Carani drive by and yell "home wrecker."  Ms. Sims identified a Nathan Lindquist as an eyewitness to the incident in which Ms. Carani drove by, and Mr. Wilson's affidavit indicates that Mr. Wilson then spoke to Mr. Lindquist, who corroborated that a woman driving a truck or SUV drove by and yelled "home wrecker," although Mr. Lindquist did not purport to specifically identify the person.

The affidavit then details Mr. Wilson's contact with Ms. Carani by phone. It notes that Ms. Carani denied having left any stickers on Ms. Sims' car, that Ms. Carani stated that she "did not like the fact that Erin Sims is having me investigate this case," that Ms. Carani admitted that she had called Ms. Sims to discuss the affair and that she had also called Ms. Sims' husband and one of Ms. Sims' friends to discuss the affair, that Ms. Carani denied having driven past Ms. Sims and yelled anything, and that she stated that "Erin Sims has brought these problems on herself by the way she conducts her personal life."

Finally, the affidavit discusses Mr. Wilson's contacts with Mr. Sappington, who is apparently Ms. Sims' boss. Mr. Sappington stated that Ms. Carani had called him on November 2, 2007, that Ms. Carani "asked him to speak with Erin Sims regarding an alleged affair" with Mr. Carani, that he had also received a phone call from Mr. Carani the same morning and that Mr. Carani had stated that "he will take care of this if [Ms. Carani] gets arrested," a statement Mr. Sappington understood to mean that Mr. Carani "may harm Erin Sims in some way if Shelley Carani were to be arrested."

The Caranis' summary judgment response does not dispute that the facts reported by Mr. Wilson in the affidavit accurately convey what Mr. Wilson was actually told during his investigation. Although the Caranis indicated that, in actuality, other people have since acknowledged that they were responsible for the stickers on Ms. Carani's car and the incident in which a driver yelled "home wrecker" at Ms. Sims, they do not allege that they advised Mr. Wilson of that fact at the time or otherwise point to evidence in Mr. Wilson's investigation that should have revealed those facts. Indeed, Ms. Carani testified in her deposition that although she knew who had put the notes on Ms. Sims' car, she did <u>not</u> tell Mr. Wilson because she "wasn't

asked" and was afraid that the other person would get in trouble. Ms. Carani acknowledged that, in her discussion with Mr. Wilson, she "got the impression that he thought [she] might have been the one to put those notes on Ms. Sims' vehicle," but purposefully decided not to provide him with the name of the person who actually committed the act. Thus, for purposes of determining whether the Rifle Police Defendants are entitled to summary judgment on their affirmative defense to Ms. Carani's false arrest/false imprisonment claim, the Court finds that the facts – as they appeared to the police Defendants at the time Ms. Carani was arrested – are not in dispute.

When Ms. Carani arrived at the police station at approximately 6:00 p.m. on November 2, 2007, Defendant Stewart arrested her pursuant to Mr. Wilson's affidavit. Mr. Wilson's affidavit indicates that Ms. Carani was to be arrested on two charges: harassment, in violation of C.R.S. § 18-9-111(4)(III), and domestic violence, in violation of C.R.S. § 18-6-801. The crime of "harassment - stalking," as defined in C.R.S. §. 18-9-111(4)(b)(III), is committed when a person knowingly

> repeatedly follows, approaches, contacts, places under surveillance, or makes any form of communication with another person, a member of that person's immediate family, or someone with whom that person has or has had a continuing relationship in a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person . . . to suffer serious emotional distress.

Although the arrest affidavit listed "domestic violence" pursuant to C.R.S. § 18-6-801 as one of the charges to be brought against Ms. Carani, that statute does not define a substantive crime. C.R.S. § 18-6-801 provides for certain sentencing enhancements and other penalties when a person is "convicted of any crime, the underlying factual basis of which . . . include[s] an act of domestic violence, as defined in section 18-6-800.3(1) . . . when such crime is used as a

13

method of coercion, control, punishment, intimidation, or revenge directed against a person with whom the actor is or has been involved in an intimate relationship. . . ."

On this record, the Court finds that, on the undisputed facts discussed above, the Rifle Police Defendants had probable cause to believe that the crime of "harassment - stalking" had occurred and that Ms. Carani had committed that act. As set forth in the statute, that crime has four elements: (i) a person repeatedly follows, contacts, or otherwise communicates; (ii) with another person or someone connected to that person; (iii) in a manner that would cause the person to suffer serious emotional distress; and (iv) the person did indeed suffer such distress. One could infer, from the facts as appearing to Mr. Wilson and recited in his affidavit, that all four elements were present. Ms. Carani had made repeated contacts with Ms. Sims and persons close to her: Ms. Carani admittedly made telephone calls to Ms. Sims, Ms. Sims' friend, Ms. Sims' husband to discuss the affair. She also called Ms. Sims' boss to discuss the matter. In addition, it is undisputed that Ms. Sims stated (mistakenly, as it would later be revealed) to Mr. Wilson that Ms. Carani had "communicated" with her by yelling "home wrecker" out the window as Ms. Carani drove by. Finally, Mr. Wilson could reasonably infer[9] (inaccurately, as it would turn out) from the situation that Ms. Carani was also "communicated" with Ms. Sims by

---

[9]One can hardly say that, in these circumstances, Mr. Wilson's belief that Ms. Carani was responsible for the notes on Ms. Sims' car was an unreasonable extrapolation from the facts. The notes clearly expressed someone's belief that Ms. Sims had been engaged in a sexual relationship with a married person – *i.e.* references to "home wrecker" and "slut" – and Ms. Carani had admitted to harboring just such concerns about Ms. Sims' relationship with Ms. Carani's husband. The reasonableness of Mr. Wilson's inference to this effect is essentially acknowledged by Ms. Carani's own deposition testimony, where she admitted that she believed that Mr. Wilson had concluded that she was responsible for the notes; if Mr. Wilson's inference was unreasonable, one would expect that Ms. Carani either would not recognize the possibility that Mr. Wilson might have drawn that inference or would have otherwise have sought to disabuse him of such an unreasonable belief.

leaving notes on her car. Thus, Mr. Wilson's affidavit reveals repeated "communications" by Ms. Carani with Ms. Sims, directly or indirectly, thus satisfying the first two elements of the offense.

The affidavit also indicates that Ms. Carani's communications were of a type that would cause a reasonable person to suffer serious emotional distress. Most tellingly, the notes left by Ms. Carani (as Mr. Wilson believed) on Ms. Sims' car are clearly intended to insult and humiliate Ms. Sims, calling her a "slut" and a "home wrecker," and having been posted in a conspicuous public place that would attract the attention of strangers. Similarly, Ms. Carani (as Ms. Sims stated) driving by and yelling "home wrecker" at Ms. Sims while Ms. Sims stood in public with another person is another instance of a communication intending to cause Ms. Sims to feel insulted and humiliated in front of others. Finally, although one might not necessarily assume that a single phone call between Ms. Carani and Ms. Sims about the alleged affair would necessarily cause Ms. Sims to suffer serious emotional distress, a reasonable person might be expected to suffer severe emotional distress once Ms. Carani began contacting Ms. Sims' husband, friends, and boss about the affair. One might be able to craft some moral justification for Ms. Carani to have contacted Ms. Sims' husband, but there can be little justification beyond humiliation and vengeance for Ms. Carani to have called Ms. Sims' friend to tarnish Ms. Sims' character, and even less justification for Ms. Carani to have contacted Ms. Sims' boss. To the extent Mr. Wilson harbored any doubts about Ms. Carani's motive in making these phone calls, Ms. Sims' statement to Mr. Wilson that Ms. Carani had stated "I'm gonna make you feel the way I feel" and "You can consider this a threat" would be sufficient to demonstrate that Ms. Carani intended Ms. Sims to feel embarrassment and scorn from her family, friends, and boss as a result

of these communications.  This is sufficient to establish the third element of the offense, and

there is no dispute that Ms. Sims did indeed suffer emotional distress from these

communications, thus establishing the fourth element of the crime.

Accordingly, the Court finds that the facts revealed in Mr. Wilson's investigation gave

him probable cause to believe that Ms. Carani had committed the crime of "harassment -

stalking," justifying his directive that she be arrested for that crime.  This alone is sufficient to

entitle all of the Rifle Police Defendants to summary judgment on the false arrest claim.

The Caranis have made much of the fact that Mr. Wilson's affidavit directed that Ms.

Carani also be charged with "domestic violence," a "crime" that does not actually exist.  The

Caranis contend that this endorsement prolonged Ms. Carani's incarceration, because policies in

the City of Rfile require that persons charged with domestic violence offenses will not be

released on bond prior to making their initial appearance before a judge.  Had Ms. Carani been

arrested solely on the harassment - stalking charge, without the accompanying domestic violence

allegation, she would have been able to immediately post bond and avoid spending the weekend

in jail.  The Caranis have tendered the opinion of Charles McCrory in support of this contention,

and the Court has found that the foundational requirements of Fed. R. Evid. 702 were met with

regard to this particular opinion, and thus, the Court accepts this as proffered evidence that but

for the domestic violence endorsement on the arrest affidavit, Ms. Carani would have been

incarcerated for only a brief time on November 2, 2007, rather than until November 5, 2007.

This prolonging of her incarceration might arguably support an independent false imprisonment

claim, as distinct from a claim challenging her arrest in the first instance.

As with the false arrest analysis above, the Caranis must make a *prima facie* showing of

false imprisonment by showing that: (i) Ms. Carani's freedom of movement was restricted by Mr. Wilson's inclusion of the domestic violence endorsement on the arrest affidavit (ii) that Mr. Wilson intended to so limit her freedom of movement by including that endorsement; and (iii) that Ms. Carani was aware of the limitations on her freedom. The Court finds that the Caranis can easily show the first and third elements, but the evidence in support of the second element is less clear.

There is no clear evidence in the record that indicates that Mr. Wilson purposefully chose to include the domestic violence endorsement on the arrest affidavit because he knew that that endorsement would cause her to stay in jail until the following Monday, while an arrest only on the harassment - stalking charge might allow her to be released earlier. The Court has reviewed the excerpts from Mr. Wilson's deposition that the parties have provided, and has located only one passage that bears on this issue:

> Q: Were you aware that if Ms. Carani was arrested on a Friday afternoon that she might not be brought before a magistrate until Monday morning?
>
> A; I was.
>
> Q: Did you give any thought to waiting until Monday before having the affidavit served on her and the arrest made?
>
> A: Um, I had no intention of going and looking for Ms. Carani that weekend, nor did I believe that Ms. Carani was going to come in that weekend.

The first portion of this exchange indicates that Mr. Wilson was indeed aware that, if Ms. Carani was arrested on Friday afternoon, it was possible that she would spend the entire weekend in jail. But this exchange does not reveal that Mr. Wilson's understanding of this fact was

specifically correlated to the inclusion of the domestic violence endorsement in the arrest affidavit; rather, Mr. Wilson's answer appears to simply reflect his understanding that weekend jail stays may simply be the inevitable consequence of a person being arrested on a Friday afternoon.. The question is not predicated on the specific inclusion of the domestic violence allegation, nor does Mr. Wilson's answer reveal any indication that it was the domestic violence component, not the sheer fact of a Friday afternoon arrest itself, that would result in a weekend's incarceration. This testimony does nothing to advance the Caranis' burden of showing that Mr. Wilson intentionally sought to prolong her incarceration by including a domestic violence allegation in the arrest affidavit.

In addition, the second portion of the exchange suggests that Mr. Wilson had no particular intent to subject Ms. Carani to a prolonged weekend incarceration. His testimony makes clear that, although he completed the arrest affidavit and posted it to the police station bulletin board on Friday, he did not know that Mr. Carani would be coming in (and thus, likely to be arrested) that day, nor did he have any intention of effecting her arrest during the weekend. The logical inference from Mr. Wilson's testimony on this point is that he did not intend to effect Ms. Carani's arrest until the following Monday (or the days thereafter), at which point she would presumably be brought immediately before a magistrate. This testimony thus refutes any possible suggestion that Mr. Wilson intended that Ms. Carani be arrested in a way that would prolong her incarceration over a full weekend, whether as the result of a domestic violence endorsement in the arrest affidavit of not.

Simply put, there is no evidence that demonstrates that Ms. Carani's arrest on a Friday afternoon was made with the intent to extend Ms. Carani's incarceration through the ensuing

weekend.  The only evidence suggests that the prolonged  detention was simply an unfortunate series of coincidences and bad timing.  Under these circumstances, the Court would find that the Caranis have failed to carry their burden of showing Mr. Wilson's intent to extent Ms. Carani's detention, and thus, the Rifle Police Defendants would be entitled to summary judgment on the Caranis' remaining false imprisonment claim.

Even assuming that the Caranis could establish a *prima facie* case of false imprisonment based on Mr. Wilson's inclusion of a domestic violence endorsement in the arrest affidavit, the Court would nevertheless find that the Rifle Police Defendants have, under the undisputed facts in the record, carried their burden of showing an affirmative defense of privilege.  As discussed above, the Rifle Police Defendants would be required to show that Mr. Wilson had probable cause to believe that the actions he understood to have happened gave probable cause to include the domestic violence allegation in the arrest affidavit.  Although Mr. Wilson's application of the statutory text is somewhat unconventional in this circumstance, this Court finds that Mr. Wilson indeed had reasonable cause to believe that the facts he recited satisfied the statutory language.

As stated above, the cited domestic violence statute is not a substantive criminal offense, but rather, a sentencing enhancement that may be applied only when certain predicate facts are met.[10]  By its terms, the enhancement applies when the following four elements are met: (i) a person is convicted of a crime (or, as here, charged with a crime), (ii) the crime involved includes an act that is defined by C.R.S. § 18-6-800.3(1) as "domestic violence" or is a crime

---

[10]While it may be more common for a prosecutory to make the decision as to whether a domestic violence enhancement will be sought, the Caranis have not come forward with any evidence or authority that indicates that it was inappropriate for Mr. Wilson's arrest affidavit to indicate his belief that the predicate facts necessary for the application of such a sentencing enhancement were present in these circumstances.

against property, (iii) the crime was use by the person as a method of coercing, controlling, or exacting revenge against another; and (iv) the person sought to be coerced, controlled, etc. is a person with whom the actor has had an intimate relationship. C.R.S. § 18-6-801(1)(a). The definition of "domestic violence" found in § 18-6-800.3(1) essentially duplicates the remaining elements listed above: under that statute, an act of "domestic violence" is either "an act or threatened act of violence upon a person with whom the actor has been involved in an intimate relationship" or "any other crime against a person . . . when used as a method of coercion, control, [etc.] directed at a person with whom the actor is or has been involved in an intimate relationship."

Here, Mr. Wilson reasonably construed the statutory text to apply to Ms. Carani's conduct. Mr. Carani had been charged with a crime: harassment – stalking. Under the circumstances here, one could reasonably say that Ms. Carani's crime against Ms. Sims was an effort to obtain "control" (or, perhaps, gain "revenge against") someone whom Ms. Carani had an "intimate relationship" with – namely, Mr. Carani. In other words, by humiliating and driving away Ms. Sims as a competitor for Mr. Carani's attention, Ms. Carani sought to gain a greater measure of control over his affections, and perhaps to punish Mr. Carani by alienating him from Ms. Sims.

This may be an unorthodox application of the domestic violence statute, but it is not a completely unreasonable one.[11] Nothing in the statutory language requires that the victim of the

_____

[11]Defendant Boulton, another police officer whom Mr. Wilson consulted on the issue before drafting the arrest affidavit, testified that he had previously sought advice from the District Attorney on a similar case involving crimes committed against the property of a woman by a wife who believed her husband was having an affair with the woman. Mr. Boulton was instructed by the District Attorney that "that's domestic violence, it's clearly revenge against a

criminal conduct and the intimate partner being coerced, controlled, etc. be the same person. Indeed, the structure of the statute seems to contemplate this precise situation: the statute speaks of a crime committed "against <u>a</u> person," and goes on to address the coercion, control, etc. of "<u>a</u> person" in an intimate relationship with the perpetrator. If the statute intended to require that the crime victim and the person in the intimate relationship with the perpetrator be the same person, the legislature would have used a definite article – "the person" – instead of an indefinite one – "a person" – in the "intimate relationship" clause, reflecting that the "person" being referenced in both the "crime against" and "intimate relationship" clauses was the same. By instead using indefinite articles in both clauses, the legislature apparently intended that the crime victim and intimate partner could be different people. Once that proposition is recognized, Mr. Wilson's application of the domestic violence statute to the facts here is entirely reasonable.

Accordingly, because the Court finds that, on the undisputed facts here, Mr. Wilson had probable cause to include the domestic violence endorsement on the arrest affidavit, the Rifle Police Defendants are entitled to summary judgment on the Caranis' remaining false imprisonment claim. This disposes of all of Ms. Carani's claims against the Rifle Police Defendants, and because Mr. Carani's claim against these defendants is entirely derivative, the Rifle Police Defendants are entitled to summary judgment on all claims against them in this case.

---

third party to get back at her husband." Defendant Boulton also testified that, after Ms. Carani's arrest, he received a call from Anthony Hershey, a District Attorney. Mr. Hershey stated to Mr. Boulton that Mr. Hershey "and one other attorney was concerned about the domestic violence [portion of Ms. Carani's arrest], and everybody else in the [District Attorney's] office said that it was domestic violence." This evidence, at a minimum, indicates that Mr. Wilson's decision to include a domestic violence endorsement on Ms. Carani's arrest affidavit comported with <u>some</u> of the District Attorneys' understanding of the domestic violence statute, further demonstrating that Mr. Wilson's conception of the statute was not unreasonable.

4. <u>Defendants Vallario and Dawson</u>

The remaining claims in this action are asserted by Ms. Carani against Defendants Vallario and Dawson, contending that the conditions of her confinement at the Garfield County Jail were unconstitutional. (Mr. Carani's loss of consortium claim might arguably run as against these Defendants as well, but as that claim is derivative of Ms. Carani's claims, the Court limits its analysis to Ms. Carani's claims.)

A pre-trial detainee's challenge to the conditions of her confinement is analyzed under the 14th Amendment's Due Process clause, rather than the 8th Amendment's Cruel and Unusual Punishment clause. *Bell v. Wolfish*, 441 U.S. 520, 536 n. 16 (1979). However, even in pretrial detainee cases, the 8th Amendment provides the benchmark against which prison conditions are measured. *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998). Thus, to hold Defendants Vallario and Dawson personally liable for the conditions of her confinement, Ms. Carani must show, with regard to each Defendant, both an objective and subjective component. *Id.* The objective component requires her to show that the she was subjected to a "sufficiently serious" deprivation of "the minimal civilized measure of life's necessities." *Id.* In other words, jail officials must ensure that inmates receive "reasonably adequate ventilation, sanitation, bedding, hygiene materials . . . hot and cold water, light, heat, and plumbing." *Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir. 1980). It is not sufficient to show that the conditions imposed were "restrictive and even harsh," as the "constitution does not mandate comfortable prisons." *Craig*, 164 F.3d at 495-96. Rather, she must show that the conditions exceeded that deemed acceptable under "evolving standards of decency." *Id.* Examination of the objective component requires inquiry into both the severity of the violations and their duration. *Id.*; *see also DeSpain v.*

*Uphoff*, 264 F.3d 965, 973 (10th Cir. 2001) ("We have held that a situation involving filthy cells, poor lighting, inadequate ventilation or air cooling, and unappetizing food simply [did] not rise to the level of a constitutional violation where prisoners were exposed to the conditions for only forty-eight hours").

The subjective component requires her to show that each Defendant had a sufficiently culpable state of mind – namely, that he "knows of and disregards an excessive risk to inmate health and safety" that the condition poses. *Craig*, 164 F.3d at 495-96. The subjective standard is not satisfied by showing that the Defendant "should have known" of the risk; it is necessary for the plaintiff to prove that the official was indeed aware of the facts giving rise to an inference of a serious risk of harm to the inmate, and that the official actually recognized the existence of that risk. *Id.*

The facts relating to this claim, taken in the light most favorable to Ms. Carani, are as follows. Ms. Carani arrived at the Garfield County Jail at approximately 8:30 p.m. on Friday, November 2, 2007. She was given a one-piece jumpsuit, which she changed into, and was issued two wool blankets, a foam-rubber fold-up mattress, a coffee cup, comb, toothbrush, and toothpaste. She was placed in a cell that, at the time, was occupied by one other person. The cell contained a sink and toilet. At some point that evening, Ms. Carani was briefly escorted out of the cell and consulted with a nurse about medical issues.[12] She was returned to the cell, and at some point before breakfast on Saturday, a third person was brought in. At some point around lunchtime on Saturday, a fourth person was brought to the cell. Around that same time, Mr.

_____

[12]Ms. Carani testified that she was "groggy" at this time because she had, with the Rifle Police's permission, taken a double dose of Xanax before being transported to the Jail.

Carani delivered a book, reading glasses and some prescription drugs for her. Jail staff allowed her to have the glasses and some of the prescription medicines, but refused to provide the book until late afternoon on Saturday (and refused to provide the remaining medications entirely). Before dinner on Saturday, Ms. Carani was allowed to make a phone call home, and around this time, the fourth woman was taken out of the cell and did not return. Late Saturday evening or early Sunday morning, the guards announced that they would arrange showers for the women later, but did not return. Around that time, a different woman was brought into the cell, again yielding a total of four occupants in the cell. At some point after breakfast on Sunday, a fifth person was "brought in for drug court." On Sunday afternoon, Ms. Carani had a visit with her husband. Ms. Carani testified that she was reluctant to use the toilet in the cell because "in order to go to the bathroom, you had to completely remove your jumpsuit, and there was a window in the door, so your back was visible if someone were to look in the window of your door." She attempted to use the toilet only when everyone else in the cell was asleep. She had difficulty sleeping on Sunday evening because her mattress was directly in front of the cell door and "you could hear everything that was going on out there and I smelled smoke." She was admittedly "in a paranoid state" at this time and was afraid that the building might catch on fire and that she was in danger. On Monday, November 5, 2007, Ms. Carani was taken from the Jail and brought to the courthouse. She appeared in court at approximately 1:50 p.m., and after a hearing that was approximately an hour long, the charges against her were dropped. She was returned to the Jail briefly, but was released by 3:00 p.m. on Monday.

Ms. Carani has not expressly itemized those conditions of confinement she contends were unconstitutional, but in parsing her summary judgment brief, deposition, and interrogatory

responses in the record, the Court understands her to complain generally about the following conditions: (i) the cell was overcrowded, making it difficult to walk around without stepping on another person or mattress; (ii) having to use the toilet without any form of privacy; (iii) not being given the opportunity to shower; (iv) sleeping on a mattress on the floor aggravated her back problem; (v) "the food sucked"; (vi) she was not promptly given her book or the remaining medication; (vii) she went through nicotine withdrawal as a result of not being able to smoke while in the Jail; and (viii) she was not issued shoes or socks and had to go barefoot the entire time.

The Court finds that none of the conditions cited by Ms. Carani, individually or in concert, constitute conditions that could be said to amount to unconstitutional punishment. Few of her complaints implicate anything that could be said to even remotely approach a deprivation of "an identifiable human need such as food, warmth, or exercise." Being deprived of the opportunity to shower for approximately 65 hours, going without shoes for a similar period, or having to use the toilet in circumstances in which it would be possible for another person to see one's back constitute discomfort and can cause anxiety and embarrassment, but they do not rise to the level of deprivations of "the minimal civilized measure of life's necessities." *See e.g. Ledbetter v. City of Topeka*, 318 F.3d 1183, 1188 (10th Cir. 2003) (inmate who was "placed in his bare feet in a cell without a toilet for five hours" failed to allege a constitutional deprivation); *Fillmore v. Eichkorn*, 77 F.3d 492 (table), 1996 WL 82189 (10th Cir. Feb. 27, 1996) (affirming summary judgment granted to prison officials on weekend detainee's complaints that, among other things, he was denied "a chair, mattress, blanket, or pillow," was "placed in a cell with a surveillance camera," and was "ogled" by a female guard while he was naked); *Estrada v.*

*Krause*, 38 Fed.Appx. 498, 499 (10th Cir. 2002) (unpublished) (claim that inmate spent four days in intake cell with minimal clothing and bedding failed to allege unconstitutional conditions).

The fact that the cell was crowded occasionally, that Ms. Carani had to place her mattress on the floor to sleep, and that she suffered a stiff back as a result also fails to rise to a constitutional deprivation, particularly in light of the very brief period she was detained. *Compare Robeson v. Squadrito*, 57 F.Supp.2d 642, 647 (N.D.Ind. 1999) (inmate forced by overcrowding to sleep on floor for five weeks, suffering a sore back, failed to state constitutional claim). Overcrowding itself is not an unconstitutional condition, and becomes actionable only if it leads to deprivation of food, proper sanitation, or medical care, or where it is accompanied by dangerous conditions. *Id.*, *citing Rhodes v. Chapman*, 452 U.S. 337, 348 (1981). Ms. Carani points to nothing that indicates that the fact that as many as five inmates were occasionally housed in the same cell deprived her of these necessities or presented a dangerous condition. The circumstances of Ms. Carani's confinement were no more restrictive than conditions commonly found in jails and prisons across the country. They do not amount to a constitutional violation.

Accordingly, Defendants Vallario and Dawson are entitled to summary judgment on the claims against them.[13]

_____

[13]The Court does not reach the question of whether Ms. Carani adequately showed Mr. Vallario and Mr. Dawson's personal participation in the constitutional deprivation against her. Were the Court to reach that issue, it would find that Ms. Carani failed to make a sufficient showing of such personal participation. The Caranis essentially acknowledge that they cannot show that Mr. Vallario and Mr. Dawson personally participated in the alleged deprivation of Ms. Carani's constitutional rights, but contend that they are nevertheless liable on a failure to supervise theory. The Caranis' response brief does not specifically articulate and argue the facts that they contend demonstrates this failure to supervise; instead, they purport to attach deposition transcripts that are annotated with codes identifying those sections that the Caranis contend establish certain matters. The facts they intend to rely on in support of their failure to supervise contention are those marked as "F2S." No portion of Mr. Vallario's deposition is designated in

## CONCLUSION

For the foregoing reasons, the Defendants' Motions for Summary Judgment (**# 116, 132**) are **GRANTED** in their entirety. Judgment in favor of each Defendant and against the Plaintiffs shall enter contemporaneously with this Order. Erin Sims' Motion for Entry of Final Judgement (**# 94**) is **DENIED** as moot, as final judgment as to all parties shall enter as a result of this Order. There being no further claims to adjudicate, the outstanding issue relating the admissibility of Mr. Cook's opinions (**# 131**) is moot. The Clerk of the Court shall terminate the motions at Docket **# 115** and **150**, as moot.

Dated this 30th day of July, 2010

BY THE COURT:

_____

Marcia S. Krieger
United States District Judge

---

this manner, and the portions of Mr. Dawson's deposition that are so designated essentially constitute Mr. Dawson explaining, in response to certain questions about what occurred during Ms. Carani's detention, that he was not there and does not know how or why a situation was handled in a particular way. The mere fact that Mr. Dawson did not actually supervise the jail staff during Ms. Carani's detention is not the type of "failure to supervise" that can substitute for personal participation in a constitutional violation.